UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| GAY BURRIS-WILLIS, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 4:18-CV-00062-PLC |
| NANCY A. BERRYHILL,<br>Deputy Commissioner Operations,<br>Social Security Administration | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Gay Burris-Willis seeks review of the decision by Defendant Nancy A. Berryhill, Deputy Commissioner of Operations, Social Security Administration, denying her applications for Disability Insurance Benefits under the Social Security Act.[1] For the reasons set forth below, the case is reversed and remanded.

### I. Background & Procedural History

In October 2014, Plaintiff, then fifty years old, filed an application for Disability Insurance Benefits alleging that she was disabled as of September 10, 2014 due to: asthma, arthritis, De Quervain's tenosynovitis, depression, chronic bronchitis, chronic fatigue, constant pain, and stress. (Tr. 147, 152) The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 69–73; 74–76). The SSA granted Plaintiff's request for review and conducted a hearing on October 20, 2016, at which Plaintiff appeared and testified. (Tr. 30–54)

---

[1] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (2012). [ECF No. 9]

In a decision dated March 17, 2017, the ALJ applied the five-step evaluation set forth in 20 C.F.R. Section 404.1520(a) and concluded that Plaintiff "has not been under a disability within the meaning of the Social Security Act from September 10, 2014, through the date of this decision." (Tr. 17) Plaintiff timely filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review in November 2017. (Tr. 103–04, 1–6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106–07 (2000) (citing 20 C.F.R. §§ 404.900(a) (4)-(5), 404.955, 404.981, and 422.210(a)).

## II.   Evidence before the ALJ

### A.   *Testimony at the ALJ Hearing*

Plaintiff, who appeared at the hearing without counsel, testified that she was fifty-two years old and had completed one year of college. (Tr. 40) Plaintiff had previously worked as a home healthcare aide and as an administrative assistant for a correspondence school and the Census Bureau. (Tr. 41-42)

Plaintiff testified that she stopped working because "when the COPD thing hit me it was like I could barely do anything." (Tr. 42) In addition to COPD, Plaintiff's back problems, which included "a tear," "a pinched nerve," and "two bulging discs," and weakness and arthritis in her hands prevented her from working. (Tr. 42, 49) Plaintiff also believed she was depressed "because I haven't been able to work," but she was not receiving treatment. (Tr. 50)

Plaintiff explained that she had difficulty completing household chores and required help from her daughters. (Tr. 43) Plaintiff was able to dress herself and take care of her personal hygiene, but her daughters helped her wash her hair. (Tr. 44-45) Plaintiff was unable to lift "heavier things like laundry" and "even sometimes…dishes." (Tr. 45) Plaintiff testified that she

needed help grocery shopping, particularly lifting items, such as milk or a pack of ground beef, into the cart. (Tr. 45–46) Plaintiff stated she was able to drive unless "I don't feel well or I'm taking medication[.]" (Tr. 41)

The ALJ asked if Plaintiff could stoop, kneel, or pick something up from the floor. (Tr. 46) Plaintiff replied that "[i]t is challenging, but you know, I try working it out. I mean, even like walking is a chore." (Tr. 46) She estimated that she could walk for one half of a block or stand fifteen to thirty minutes before needing to rest. (Tr. 48-49) Plaintiff also had difficulty sitting and needed to change positions often. (Tr. 48)

Plaintiff's treatment for COPD included "three inhalers and the medicine for the nebulizer machine." (Tr. 46) She testified that she was not taking any pain medication because "the doctor has refused to write a prescription" because "she don't like writing narcotic prescription[s]." (Tr. 47) Plaintiff took Aleve, which "work[ed]…somewhat for the pain," used heating pads, and occasionally took her husband's pain medications. (Tr. 48)

A vocational expert also testified at the hearing regarding the work Plaintiff had performed in the last fifteen years. (Tr. 52-54) The vocational expert classified: home health attendant as a semi-skilled, medium-exertion job; fast food worker as an unskilled, medium-exertion job; and housekeeper as an unskilled, light-exertion job. (Tr. 52)

### B. Relevant Medical Evidence[2]

In June 2013, Plaintiff injured her left wrist at work. (Tr. 261–63) Later that month, Dr. Strecker, a hand surgeon, diagnosed Plaintiff's with de Quervain's tenosynovitis. (Tr. 285) Dr.

---

[2] Because Plaintiff does not challenge her mental RFC on appeal, the Court will discuss only those records relating to Plaintiff's physical impairments.

Strecker performed surgery in September 2013 and cleared Plaintiff for work in December 2013.[3] (Tr. 245, 247)

On May 13, 2014, Plaintiff visited her primary care physician, Dr. Barbara Lutey, for treatment of her asthma and shortness of breath. (Tr. 301–08) Dr. Lutey referred Plaintiff to the pulmonology department for further evaluation. (Tr. 305) A subsequent Pulmonary Function Test (PFT) revealed "a mild obstructive ventilator defect," "significant improvement after the administration of aerosolized bronchodilator," and "air trapping." (Tr. 322)

Plaintiff followed up with Dr. Lutey in June 2014 to review the results of the PFT. (Tr. 394) In addition to her asthma symptoms, Plaintiff complained of coughing at night and chest tightness. (Tr. 394) Dr. Lutey noted that Plaintiff had not filled her Flovent prescription because of its cost. (Tr. 394) Dr. Lutey advised Plaintiff that "the most important thing to improve [her quality of life]" would be twice daily use of the Flovent inhaler. (Tr. 394) Dr. Lutey also encouraged Plaintiff to stop smoking, but noted that Plaintiff "has several barriers to quitting including stress[.]" (Tr. 394)

Later in June 2014, Plaintiff presented to the emergency room with shortness of breath, chest pain, and a painful cough, which she rated as a severity of seven out of ten. (Tr. 363) The hospital's notes list Plaintiff's diagnoses as: asthma exacerbation, chest pain, hypokalemia, gastroesophageal reflux disease (GERD), osteoarthritis, generalized anxiety disorder, depression, and nicotine dependence. (Tr. 353–54) The emergency room physician noted moderate respiratory distress and bilateral wheezing, which was greater in her left lung. (Tr.365) The doctor treated Plaintiff for asthma exacerbation and discharged her the next day. (Tr. 368, 358–62)

---

[3] In February 2016, Plaintiff underwent a similar surgery on her left wrist. (Tr. 589-90)

Plaintiff returned to the emergency room in November 2014, complaining of shortness of breath and chest pain. (Tr. 422) On examination, the emergency room doctor found that Plaintiff had decreased breath and wheezing and he admitted her to the hospital for further evaluation and treatment. (Tr. 427, 429) A chest x-ray revealed no acute cardiopulmonary diseases. (Tr. 431) Two days later, a doctor diagnosed Plaintiff with COPD exacerbation, determined her condition had stabilized, and discharged her from the hospital. (Tr. 421, 424)

In early December 2014, Plaintiff presented to the emergency room with bilateral leg and hip pain that prevented her from walking. (Tr. 441) A nurse practitioner examined Plaintiff and noted tenderness in her lower spine and a positive straight leg raise on the left at forty-five degrees. (Tr. 438–39) A doctor's examination found "tenderness in hip, knees," "pain with internal and external rotation," "tenderness to palpation on lumbar region; no back pain in ROS, only on exam." (Tr. 443-44) An x-ray of Plaintiff's lumbar spine revealed a mild levoconvex curvature in her thoracic spine, mild disc space narrowing at L5-S1 without significant facet arthropathy, and no acute fracture. (Tr. 447–48) Hospital staff discharged Plaintiff the following day. (Tr. 437)

Plaintiff followed up with Dr. Lutey a few days later to discuss her recent hospitalizations for asthma, COPD, and leg weakness. (Tr. 670-74) Plaintiff complained of continued pain that "is always in the hips and extends down to her legs," as well as "tingling and numbness extending down legs into feet." (Tr. 670) Dr. Lutey opined that the "likely etiology seems to be impingement." (Tr. 673) Dr. Lutey counseled Plaintiff about smoking cessation and ordered an MRI. (Tr. 673)

On December 22, 2014, Dr. Esteban Alejo, a non-examining state agency medical expert, reviewed Plaintiff's medical records and assessed her physical residual functional capacity

5

(RFC). (Tr. 62-64) Dr. Alejo found that Plaintiff had the following impairments resulting in exertional limitations: asthma, arthritis, De Quervain tendosinovitis, chronic bronchitis, and chronic fatigue. (Tr. 63) Dr. Alejo concluded that Plaintiff could: frequently lift ten pounds and occasionally lift twenty pounds; stand or walk for six hours in an eight-hour workday; and sit for six hours of an eight-hour workday. (Tr. 62) Dr. Alejo also found that Plaintiff should avoid exposure to environmental irritants, and she could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. (Tr. 63) In support of his opinion, Dr. Alejo cited Plaintiff's "fairly normal" PFT and activities of daily living, which included caring for a brother with autism, preparing meals, cleaning the house, using a computer, and driving. (Tr. 64)

Plaintiff underwent an MRI of her lumbar spine on January 2, 2015. (Tr. 453-54) The MRI revealed: "mild disc space narrowing at L3-L4 through L5-S1"; "an anular fissure is present at L5-S1"; "a mild disc bulge is present" at L3-L4 and L5-S1; "[a] left foraminal disc extrusion with superior migration severely narrows the left neural foramen, abutting and appearing to compress the exiting left L4 nerve root"; and "mild superimposed disc bulge along with mild facet arthropathy minimally narrows the right neural foramen without significant spinal canal stenosis." (Tr. 454) The reviewing radiologist recorded the following impressions: "Left L4-L5 foraminal disc extrusion abuts and appears to compress the exiting left L4 nerve root" and "mild lumbar spondylosis." (Tr. 454) Dr. Lutey reviewed the MRI and referred Plaintiff to a neurosurgeon. (Tr. 675)

Plaintiff had a follow-up appointment with Dr. Lutey in February 2015. (Tr. 685-90) Dr. Lutey adjusted Plaintiff's gabapentin and advised her to stop smoking, use her inhaler twice daily, and exercise. (Tr. 688)

Later that month, Plaintiff presented to the emergency room with shortness of breath and wheezing and was diagnosed with acute COPD exacerbation. (Tr. 460, 463) The emergency room doctor who examined Plaintiff observed bilateral wheezing, tight chest wall with inspirations, and that Plaintiff was in respiratory distress. (Tr. 466) Hospital staff discharged Plaintiff two days later, noting that her condition improved with oral steroids. (Tr. 458)

In April 2015, Plaintiff established care with Dr. Adam LaBore, an orthopedic surgeon. (Tr. 539–40) Plaintiff described her pain as "severe, continuous to some extent, exacerbations that are unpredictable that occur sometimes sitting, sometimes standing." (Tr. 539) Based on his physical examination and review of Plaintiff's x-rays and MRIs, Dr. LaBore concluded: "Likely radicular pain secondary to the L4-L5 disc herniation producing particularly foraminal stenosis on the left at L4. However, her history and physical examination are not entirely consistent with this." (Tr. 540) Dr. LaBore recommended physical therapy and prescribed hydrocodone "to facilitate participation in physical therapy." (Tr. 540).

Plaintiff began physical therapy on April 15, 2015. (Tr. 509) At her initial assessment, the physical therapist noted that Plaintiff's chief complaint was "burning and pressure pain in her back and with throbbing and stabbing pain in bilateral hips. Pain is constant and increased with walking, prolonged sitting and standing." (Id.) The physical therapist's observations included: "signs of bilateral lower extremity weakness, pain with positional intolerance, postural deviations, lower extremity paresthesia, core weakness, and decreased ability for [activities of daily living] due to her current condition." (Tr. 514) Plaintiff's long-term goals for physical therapy included seventy percent symptomatic improvement "to enable patient to perform ADLs with min[imal] pain." (Tr. 510)

7

At Plaintiff's next physical therapy session on April 17, Plaintiff reported her pain was a five or six on a ten-point scale, and she brought "her TENS unit with her for instruction." (Tr. 516) The physical therapist wrote that Plaintiff's "pain was decreased to 3/10 after manual treatment" and she "continues to display difficulty tolerating positions and requires modifications at times." (Tr. 517) On April 20 and April 23, Plaintiff reported her pain was a one or two, and on April 27 she reported "continuing to feel better" and her pain was a two. (Tr. 519, 522, 525)

At her final physical therapy session on May 1, 2015, Plaintiff informed the physical therapist that "a lot of her symptoms now have to do with physical activity. She noted problems with sewing earlier this week." (Tr. 528) The physical therapist opined that Plaintiff had "met 90% of her goals for therapy" and was a "[g]ood candidate for discharge." (Tr. 530).

In June 2015, Plaintiff presented to the emergency room with worsening shortness of breath, productive cough, chills, and nausea. (Tr. 492) Plaintiff reported that she could not walk across a room without shortness of breath. (Tr. 492) The emergency room doctor observed "mild respiratory distress" and wheezing. (Tr. 494)

Plaintiff followed up with Dr. LaBore in July 2015 and reported that her "low back symptoms are improved though not perfect." (Tr. 536) On examination, Dr. LaBore noted: "appears well sitting"; "transfers sit to stand without difficulty"; "ambulate with a mildly slowed cadence external rotation stance on the right and left but symmetric, no antalgia;" no pain with "supine hip range of motion"; and "no sensory or motor deficits in the lower extremities." (Id.) Plaintiff reported taking hydrocodone "very occasionally," and Dr. LaBore did not believe surgical intervention or corticosteroid injection "appear predictably helpful." (Id.) He stated: "At this time she feels symptoms are adequately controlled, particularly in reference to her

8

ability to maintain function and limited context of other medical problems." (Id.) Dr. LaBore prescribed a single refill of hydrocodone and advised Plaintiff to follow-up with Dr. Lutey. (Tr. 536) An MRI revealed "mild L3-L4 and L4-L5 degenerative disc disease." (Tr. 545)

Plaintiff returned to Dr. Lutey's office later that month to follow up on her breathing problems. (Tr. 534) Plaintiff reported recent "flareups [sic] of her breathing requiring prednisone," but she noticed improvement when she resumed taking her Advair inhaler twice daily. (Tr. 534)

On September 3, 2015, Plaintiff was involved in a car accident and presented to the emergency room with neck and back pain. (Tr. 558) Plaintiff rated her pain as nine on a ten-point scale, and a physical examination revealed "mid-line c-spine tenderness and thoracic tenderness." (Tr. 559-60) X-rays did not show any fractures, but "small osteophytes are noted at C5-C6." (Tr. 562) The next day, Plaintiff left the hospital with prescriptions for Percocet and ibuprofen. (Tr. 564)

Plaintiff saw Dr. Lutey on September 15, 2015 to follow-up on her recent car accident. (Tr. 698) Plaintiff informed Dr. Lutey that, in the past, she was able "avoid any more invasive treatment such as injections or surgery by doing physical therapy and exercises and pain pills." (Tr. 698) However, Plaintiff told Dr. Lutey that physical therapy was "too costly to continue." (Id.) Dr. Lutey provided Plaintiff a "short term refill of narcotics[.]" (Tr. 701)

At Plaintiff's next appointment with Dr. Lutey in November 2015, Plaintiff complained of "back and hip pain, also some hand problems." (Tr. 705) Plaintiff described side effects from gabapentin and cyclobenzaprine "which limits available pain meds," and Dr. Lutey cautioned Plaintiff that she "will not prescribe narcotics indefinitely." (Tr. 704) Dr. Lutey prescribed

Percocet and Vicodin, and she advised Plaintiff to "consider topical agents," "follow up with neurosurgery about back problems," and quit smoking. (Tr. 705)

In May 2016, Plaintiff went to the emergency room with shortness of breath, chills, and productive cough. (Tr. 595) The emergency room doctor prescribed antibiotics, "a steroid burst," and nebulizer treatments. (Tr. 598)

Plaintiff returned to Dr. Lutey's office for a follow-up appointment in August 2016. (Tr. 717-22) Plaintiff complained of worsening shortness of breath and cough "due to the seasons changing." (Tr. 717) Plaintiff ran out of Advair about one month earlier but had not refilled it "because there is a $50 copay." (Id.) In regard to her back pain, Plaintiff informed Dr. Lutey that she had not followed up with Dr. LaBore because "she has been more focused on her breathing." (Id.) Plaintiff stated that "she is out of her norco" and "she takes some of her husband's norco for pain." (Tr. 717) Dr. Lutey prescribed meloxicam and directed Plaintiff to follow up with Dr. LaBore. (Tr. 721)

### III. Standards for Determining Disability Under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . " 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities; or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## IV.     The ALJ's Determination

In a decision dated March 17, 2017, the ALJ applied the five-step evaluation set forth in 20 C.F.R. Section 404.1520. (Tr. 17–18) The ALJ determined that Plaintiff: had not engaged in substantial gainful activity since September 10, 2014; had the severe impairments of degenerative disc disease, COPD, and asthma; and had the non-severe impairments of GERD, De Quervain's tenosynovitis, depression, and anxiety. (Tr. 19-20) The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20)

The ALJ found that Plaintiff's "severe impairments could reasonably be expected to produce some symptoms," but that "[Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22) Based on his review of Plaintiff's testimony and medical records, the ALJ determined that Plaintiff had the RFC to perform light work with the following limitations: "she is limited to occasional climbing ramps, stairs, ladders, ropes, and scaffolds. She can occasionally stoop, kneel, crouch, and crawl. Due to her pulmonary disease,

she should avoid concentrated exposure to pulmonary irritants such as fumes, odors, and gases." (Tr. 21)

In regard to Plaintiff's COPD and asthma, the ALJ found that "her condition is typically well controlled with medications." (Tr. 22) The ALJ stated: "She experiences intermittent exacerbations of her symptoms, which is common for people with these chronic diseases, but has always promptly responded to treatment with a good recovery, and a return to baseline functioning." (Tr. 22) In support of his conclusion that Plaintiff's COPD and asthma "does not significantly limit her ability to function," the ALJ cited Plaintiff's PFTs, which "consistently show[ed] only a mild obstructive defect." (Id.)

Turning to Plaintiff's lumbar spine, the ALJ noted that an x-ray of December 2014 showed "mild levoscoliosis and mild degenerative disc disease" and an MRI in January 2015 revealed "herniated disc at L4-5 causing pressure of the L4 nerve root." (Id.) However, the ALJ found that Plaintiff's "spinal disorder improved significantly with conservative treatment[.]" (Id.) In support of this determination, the ALJ noted that Plaintiff: "was treated conservatively…with physical therapy and steroids"; was discharged from physical therapy in May 2015 "having met 90% of her goals"; increased her range of motion and muscle strength; and "reported to her doctor" in July 2015 "that she was doing well and only rarely needed hydrocodone[.]" (Id.)

In formulating Plaintiff's RFC, the ALJ assigned "significant weight" to the RFC assessment of the non-examining state agency physician, Dr. Alejo. (Tr. 22-23) The ALJ explained that Dr. Alejo reviewed Plaintiff's medical records and "found her capable of full-time competitive work at the light level of exertion as long as she had a few additional minor restrictions." (Tr. 22) The ALJ credited Dr. Alejo's assessment because it was "well-reasoned,

and supported by the objective medical evidence[.]" (Tr. 22-23) The ALJ further noted that Dr. Alejo was "familiar with [SSA] Rules, Regulations, and Programs." (Tr. 23)

At step four of the sequential evaluation, the ALJ determined that Plaintiff was unable to perform her past relevant work as a home healthcare worker, food service worker, housekeeper, office clerk, and stand attendant. (Id.) At step five, the ALJ applied the Medical-Vocational Guidelines and determined that, given Plaintiff's age, education, work experience, and RFC, there existed a significant number of jobs in the national economy that Plaintiff could perform. (Id.) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 24)

## V. Discussion

Plaintiff argues that substantial evidence did not support the ALJ's RFC determination because the ALJ: (1) erred in giving significant weight to the non-examining state agency physician's opinion; (2) failed to properly evaluate Plaintiff's subjective complaints of pain; and (3) made inconsistent and conclusory findings in regard to Plaintiff's COPD. [ECF No. 21] Defendant counters that the ALJ properly evaluated the record, including Plaintiff's subjective complaints and medical opinion evidence. [ECF No. 28]

### A. Standard for Judicial Review

A court must affirm an ALJ's decision if it supported by substantial evidence. 42 U.S.C. § 405(g); see also Jones v. Astrue, 619 F.3d 963, 968 (8th Cir. 2010). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Brown v. Colvin, 825 F.3d 936, 939 (8th Cir. 2016)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, "as long as substantial

evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently." Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002)).

A court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff, 421 F.3d at 789). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); see also Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

B. RFC

Plaintiff claims the ALJ erred in formulating her RFC because the ALJ assigned "significant weight" to the opinion of a non-examining, state agency medical expert, Dr. Alejo. [ECF No. 21] More specifically, Plaintiff argues that Dr. Alejo's medical opinion was not a reasonable basis for finding Plaintiff was capable of performing light work because Dr. Alejo: (1) did not examine Plaintiff; and (2) only reviewed those medical records available through December 22, 2014, the date of his opinion. In response, Defendant asserts that the ALJ properly "weighed medical-opinion evidence in the context of other evidence…and determined that Dr. Alejo's opinion was in concert with substantial evidence." [ECF No. 28 at 10]

In determining a claimant's RFC, the ALJ is required to consider the medical opinion evidence of record together with the other relevant evidence. 20 C.F.R. § 404.1527(b). Opinions of non-examining sources are generally given less weight than those of examining sources. Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010). When evaluating non-examining sources' opinions, the ALJ should consider "the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." Id. (quoting 20 C.F.R. § 404.1527(d)(1)). "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003). See also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (relying upon non-examining, non-treating physicians to form an opinion on a claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record).

Here, the only medical opinion evidence in the record relating to the effects of Plaintiff's physical impairments was Dr. Alejo's RFC assessment. Dr. Alejo never examined Plaintiff and based his RFC assessment entirely on Plaintiff's medical records. Moreover, Dr. Alejo completed the Plaintiff's RFC assessment on December 22, 2014, nearly two years before the administrative hearing on October 20, 2016. "[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation." McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Wildman, 596 F.3d at 968).

Plaintiff received considerable medical treatment, especially in regard to her degenerative disc disease, in the twenty-two months after Dr. Alejo reviewed her records. Dr. Alejo's opinion relied solely on the records from Plaintiff's emergency room visit and x-ray of December 2014,

which appeared to be the first episode of Plaintiff's back, leg, and hip pain. Based on those records, Dr. Alejo noted: "LSXR. Mild narrowing L5 S1. w/t facet arthropathy or osteocyte formation." However, in the months following that emergency room visit, Plaintiff underwent medical imaging and established care with an orthopedic specialist. The MRI of January 2015 revealed more extensive impairments, namely, "[l]eft L4-L5 foraminal disc extrusion abuts and appears to compress the exiting left L4 nerve root" and "mild lumbar spondylosis." Plaintiff's July 2015 MRI showed "mild L3-L4 and L4-L5 degenerative disc disease."

In April 2015, Dr. LaBore began treating Plaintiff's back pain, prescribing hydrocodone and physical therapy. The physical therapy reduced Plaintiff's pain and, in July 2015, Plaintiff informed Dr. Labore that her pain was "adequately controlled." However, Plaintiff's medical records reveal that, after a car accident in September 2015, she presented to the emergency room with severe back and neck pain. At this point, Plaintiff's primary care physician, Dr. Lutey, resumed care of Plaintiff's back pain, which she treated with narcotic pain medication. Also absent from Dr. Alejo's assessment were Plaintiff's continued efforts to control her COPD and asthma, which included two emergency room visits. Given the time elapsed and the number of medically significant intervening events between Dr. Alejo's opinion and Plaintiff's hearing, Dr. Alejo's opinion did not constitute substantial evidence upon which to base Plaintiff's RFC. See, e.g., McCoy, 648 F.3d at 616; Dixon v. Barnhart, 324 F.3d 997, 1002-03 (8th Cir. 2003); Cooper v. Berryhill, No. 4:15-CV-1758-JAR, 2017 WL 395297, at *5 (E.D. Mo. Jan. 30, 2017).

Furthermore, the ALJ summarized the evidence of Plaintiff's medical examinations and treatment received in the twenty-two months after Dr. Alejo provided his medical opinion, but the ALJ did not discuss or examine how such evidence demonstrated that Plaintiff could perform light work. Moreover, the ALJ did not explain why Plaintiff's MRIs or treatment notes led him

16

to the conclusion that Plaintiff could perform light work. Nor did the ALJ explain the apparent inconsistency in his finding that Plaintiff could not perform any past relevant work, including the light-exertion occupation of housekeeper, while determining that Plaintiff was capable of full-time competitive work at the light level of exertion with "a few additional minor restrictions." (Tr. 22) See, e.g., Nevland, 204 F.3d at 858 ("An administrative law judge may not draw upon his own inferences from medical reports.").

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). When a critical issue is undeveloped, fully developing the record requires that the ALJ re-contact a treating or consulting physician. Vossen, 612 F.3d at 1016 (citing Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). Here, the record contains no opinion from a treating physician regarding Plaintiff's work-related limitations, and Plaintiff did not undergo a consultative physical examination. In the absence of such evidence, the ALJ relied on a nearly two-year-old medical opinion, drafted by a non-examining physician, when he found that Plaintiff was capable of light work. As a result, the ALJ's RFC determination was not supported by substantial evidence. See Ivey v. Colvin, No. 1:12-CV-131-LMB, 2013 WL 5217026, at *10 (E.D. Mo. Sept. 17, 2013).

## VI. Conclusion

For the reasons set forth above, the Court finds that the ALJ's determination that Plaintiff retained the RFC to engage in light work was not supported by substantial evidence on the record

as a whole.[4] The Court therefore reverses and remands this case for a proper assessment of Plaintiff's functional limitations resulting from her impairments.

Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of April, 2019

---

[4] Because the Court finds that the ALJ improperly relied on the medical opinion of a non-examining physician such that substantial evidence did not support the ALJ's RFC determination, the Court addresses only the first issue Plaintiff raised.